**Hearing Date, July 8, 2013 at 9:30 A.M.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SIEGMUND STRAUSS, INC., | Small Business Chapter 11 |
| Debtor. | Case No. 13-10887 (MG) |

**DEBTOR'S PRE-TRIAL MEMORANDUM IN SUPPORT**
**OF ESTIMATION AND MOTION TO EXPUNGE**
**THE RODRIGUEZ PARTIES' CLAIM (CLAIM NO. 33)**

**Preliminary Statement**

This claim arises out of a dispute that was extensively litigated in State Court prior to the filing of this Chapter 11 proceeding. As a result of an action commenced by Debtor ("Strauss") in June 2006 (the "State Court Action"), the Supreme Court of the State of New York (Fried, J.) (the "Supreme Court") entered Judgment, dated April 7, 2009 (the "Judgment") in Strauss's favor.

In proceedings leading up to the Judgment, the Supreme Court considered and dismissed all of the counterclaims asserted by Claimants (the "Rodriguez Parties"). In post-Judgment Appellate Proceedings, the New York State Supreme Court, Appellate Division and the New York Court of Appeals affirmed the decisions and Judgment of the Supreme Court in all respects except one.

The Appellate Division, on remand from the Court of Appeals, determined that, in addition to the various claims asserted by the Rodriguez Parties that were properly dismissed, the Rodriguez Parties' counterclaims could be read to include a claim for breach of contract. The Appellate Division ruled that, subject to Strauss's defenses, the Rodriguez parties should have

15807343v.1

been allowed to pursue this claim for breach of contract against Strauss. It was a this point that this Chapter 11 proceeding was filed. Consequently, the validity of the Rodriguez Parties' claim for breach of contract has never been determined in the State Court Action.

Thus, the sole issues before this Court are (i) whether the Rodriguez Parties can establish that a valid, enforceable contract existed between Strauss and the Rodriguez Parties, (ii) whether Strauss is liable to the Rodriguez Parties for damages for breaching that contract and (iii) the measure of damages, if any, arising from breach of that contract. The Rodriguez Parties should not, and indeed may not as a matter of law, attempt to assert any other sort of claim for "quasi contract, quantum meruit, unjust enrichment or the like against Strauss. All such claims, excepting only the breach of contract claim, were either expressly dismissed by the Supreme Court or merged into the Judgment that was sustained by the New York Court of Appeals.

With respect to the Rodriguez Parties' sole remaining claim for breach of contract, for the reasons set forth below, it is respectfully submitted that the Rodriguez Parties' claims should be rejected.

There was no contract, as material terms of the transaction had not been agreed to by the parties. Equally important, an express condition precedent to all of Strauss's purported obligations under any such agreement was never satisfied.

There was no breach. As discussed in detail below, many of the terms of the purported contract for which the Rodriguez Parties seek to recover are simply made up and cannot be found anywhere in the materials proffered by the Rodriguez Parties to document the purported agreement.

Finally, there were no damages. The Rodriguez Parties cannot meet their burden of proof in establishing damages. For example, it will be shown at trial that the Rodriguez Parties cannot

show what inventory they had, how much inventory they recovered and what they did with it. Rather, the record shows that the Rodriguez Parties' inflated and overstated the value of their inventory-- which consisted of a substantial quantity of damaged, expired, condemned and otherwise unsaleable goods -- and failed to mitigate their damages by recovering their inventory, despite repeated opportunities to do so.

In short, on the one issue that remains unresolved by the State Court Action -- whether the Rodriguez Parties may recover for breach of contract -- it is respectfully submitted that the answer is that they are not entitled to recover anything.

### Statement of Facts

Strauss was a wholesale meat market, selling meat, dairy products, seafood and groceries, as well as fruits, produce, Jamaican, West Indian, and African products. Until 2006, Strauss operated at the Bronx Terminal Market (the "Market"). In 2006, as a result of development plans for the Bronx Terminal Market, Strauss and the other tenants at the Bronx Terminal Market lost their leases and were required to find new space. Statement of Undisputed Facts, dated June 25, 2013 ("Facts") ¶¶ 1-2, 4.

Strauss was familiar with a similar business located just outside of the Market, Twinkle Import Co., Inc. ("Twinkle"), owned by Roberto Rodriguez. Twinkle operated a large facility adaptable to Strauss's needs and Twinkle sold many of the same or similar products and different lines. Facts ¶¶ 6-9.

Twinkle operated from leased space at 110 East 149th Street, Bronx, New York (the "Premises"). The lease for the Premises was held by another entity, owned by the Rodriguez Parties, Windsor Ltd. ("Windsor"). As part of the Strauss-Twinkle negotiations, Strauss sought

to have Windsor, negotiate and acquire a new long term lease from the landlord in Strauss's name. Windsor's lease was due to expire on August 31, 2007. Facts

Twinkle was, at the time, in acute financial trouble. In February and March 2006, during the negotiations surrounding a potential merger or acquisition of their businesses, Strauss made two $25,000 loans to the Rodriguezes. Debtor's Exhibit 69. Neither of these loans were ever repaid.

Under the terms discussed and negotiated, Twinkle was to completely cease all business operations and pay all their vendors and other debtors in full (an amount that Rodriguez grossly understated in his negotiations with Strauss) out of their earned percentage of the delivery business. In addition, Strauss was to pay $100,000 for Twinkle's property, plant and equipment. Under the anticipated transaction Strauss was to pay Twinkle as a sales agent a percentage for Twinkle's delivery business only, and no share of the entire volume of the walk in trade and deliveries of Strauss.

Strauss was also to pay Twinkle for the inventory on hand at the time the businesses began operating together under the Strauss name. However, Twinkle did not regularly perform physical counts of its inventory. Instead, year upon year, it maintained a "perpetual inventory" simply adding the amount of its purchases and subtracting the amount of its sales, without ever actually inspecting the stock on the shelves. Deposition of Roberto Rodriguez, June 7, 2013, at 35.[1] During the negotiations, Mr. Mayer performed a spot check, testing selected items of physical inventory against the perpetual list and found significant discrepancies and that the perpetual inventory substantially overstated the amount and value of the inventory. Much of the inventory was in very poor condition, expired or unsaleable. Indeed, on May 3, 2006, within

---

[1]  The deposition transcripts for the deposition of Roberto Rodriguez on June 7, 2013 and June 18, 2013 (both, the "Rodriguez Dep.") are contained in Debtors' Exhibits 44 (pages 1-141) and 70 (pages 142-208), respectively.

days of Strauss began operating in the Premises, the Agriculture Department inspected Twinkle's meat inventory and found it was improperly stored and condemned 1,800 pounds of meat that had been improperly stored. Debtor's Exhibit 48.

On or about April 26, 2006, in anticipation of finalizing negotiations and resolving open material terms, Allan Maroknek, the accountant for both Strauss and the Rodriguez Parties, drafted what he described as a "final draft" of the various agreements necessary to combine the businesses for operation out of the Premises (the "April 26 Draft"). Debtor's Exhibit 9. This draft was provided to Mr. Rodriguez on April 26, but only shown to Mr. Mayer on or about May 1, when Strauss had already moved and was ready to commence operations on the Premises.

It is this April 26 Draft, sent only to Mr. Rodriguez, and still containing handwritten changes, that the Rodriguez Parties contend contains the final terms of the "contract" between Strauss and Rodriguez. However, the April 26 Draft contained provisions that Strauss had not, and did not, agree to. Principally, the April 26 Draft states that Twinkle, after ceasing its operations, was to continue as a sales agent for Strauss and receive a commission based on all Strauss sales. In fact, Twinkle, although it had a relatively well developed delivery business, was fairly weak in cash and carry and on site sales, where Strauss's main strength lay. Consequently, Strauss was only willing to agree to pay Twinkle for delivery sales, the sales that Twinkle was contributing to the combined business. In addition, the April 26 Draft provided that Twinkle was to be paid for its inventory on the basis of Twinkle's computerized perpetual inventory. Strauss, already aware of the serious problems with that system, was only willing to pay Twinkle on the basis of a verified physical count of the Twinkle inventory. Both of these open items were material to the transaction as, in fact, they form the two largest categories of the Rodriguez Parties' claim in this action.

Most importantly, in all of the drafts of proposed terms discussed by Rodriguez and Strauss, including the April 26 Draft, renewal or extension in Strauss's name of the Windsor's lease to the Premises, which was due to expire on August 21, 2007, was a necessary precondition to all other Strauss obligations. "This entire Agreement is dependent on and subject to Strauss obtaining a lease from Windsor's landlord (East 149th St. Realty Corp.) for a minimum of a five (5) year term at a rent agreed upon between them. If Strauss is unable to obtain the same, then this Agreement is void and we will have to renegotiate our arrangement."

Rodriguez was, in fact, never able to renew or extend the lease for the Premises. Instead, in June 2006, shortly after Strauss moved in, Rodriguez illegally sublet a portion of the Premises (which under the terms discussed by Rodriguez and Strauss was supposed to be Strauss's) without Landlord's written consent, in violation of the lease. Debtor's Exhibit 10. Rodriguez failed to respond to Landlord's notice to cure and, in October 2006, Landlord terminated Windsor's lease to the Premises without Strauss ever obtaining a lease from Landlord. Debtor's Exhibit 11. Strauss was forced to enter into its own lease with Landlord after the Windsor lease was terminated. Thus, the Rodriguez Parties did not, and through their own wrongful actions rendered themselves unable, to perform an express condition precedent that was contained in the document that the Rodriguez Parties proffer as expressing the "contract" they seek to enforce.

During this time, Strauss, having already provided substantial funds to the Rodriguez Parties and in anticipation of all open issues being resolved, moved into the Premises over the last weekend in April and began operating out of the Premises as of May 1, 2006. Facts ¶¶ 22-23, 25. Roberto and Theresa Rodriguez were hired as employees of Strauss and were paid their salaries in full during the term of their employment. Facts ¶¶ 31, 33.

15807343v.1

During the month of May, while Strauss and Rodriguez continued to negotiate the terms of an agreement concerning the integration of the businesses, a number of troubling facts came to light. It was discovered that Rodriguez had materially misrepresented Twinkle's financial condition. Twinkle's finances were far worse than had been represented to Strauss before it moved into the Premises. A number of suppliers and vendors were seeking payment for products that had never been paid for, or seeking their return. E.g., Debtor's Exhibits ¶¶ 12-14.

Additionally, the equipment and fixtures that Twinkle and Windsor purportedly intended to sell to Strauss as part of the contemplated transaction turned out to be largely leased or pledged as security to third party lenders.

It was also discovered, shortly thereafter, that Roberto Rodriguez, after starting to work for Strauss, in fact continued to self-deal and do business on behalf of Twinkle, benefitting his own company at the expense of Strauss. Rodriguez was using Strauss credit cards and other resources to continue to operate and benefit Twinkle's business.

Consequently, at the end of May 2006, after it had become clear that Rodriguez was, in fact, not operating as a faithful employee of Strauss, that the Rodriguez Parties had misrepresented the facts underlying the negotiations between Strauss and the Rodriguez Parties were unable to fulfill its obligations under the terms being discussed, the Rodriguez Parties were terminated from employment by Strauss and barred from the Premises.

On June 6, 2006 litigation was commenced by Strauss in the Supreme Court New York County (Index No. 601991/2006) by Siegmund Strauss against Rodriguez for possession of the Premises, fraud and tortious interference in contractual relations.

On June 9, 2006, a stipulation was entered into by Strauss and the Rodriguez Parties providing for Rodriguez Parties to enter the Premises to inventory the Rodriguez Parties'

-7-

property, including the Twinkle merchandise inventory. Although the Rodriguez Parties' visited the Premises pursuant to this stipulation, no written inventory has ever been produced by the Rodriguez Parties. Facts ¶¶ 43-45.

On June 22, 2006, counsel for Strauss wrote to counsel for the Rodriguez Parties and invited them to remove the Twinkle inventory from the Premises. Twinkle took no steps to regain possession or control of its inventory. Debtor's Exhibit 5.

On July 6, 2006, at a hearing before the Supreme Court, Justice Fried, in the presence of Mr. and Mrs. Rodriguez, authorized the Rodriguez Parties to enter the Premises for the purpose of removing the Twinkle inventory. The Rodriguez Parties' counsel refused and instead, simply asked that the inventory be segregated and not sold, which was done. Debtor's Exhibit 6 (Transcript at 29-30).

On June 13, 2006, Strauss and Rodriguez entered into a further stipulation in court, granting Strauss sole possession of the Premises, pending a preliminary injunction hearing, for which Strauss would maintain the Rodriquez's health coverage and pay Rodriguez $40,000, among other requirements. Debtor's Exhibit 72.

Ultimately, after further proceedings and a preliminary injunction hearing, the Supreme Court declared, by decision dated September 19, 2006, that Strauss was entitled to a preliminary injunction granting Strauss sole possession of the Premises pending a determination of the action on the merits. Debtor's Exhibit 8. Yet, it was not until December 2006 or January 2007 that the Rodriguez Parties took any action to arrange for the removal of the Twinkle inventory from the Premises. Rodriguez Dep. at 15-16.

By letter, dated February 16, 2007, some nine months after the dispute began and five months after the Supreme Court had granted a preliminary injunction giving Strauss sole

possession of the Premises pending trial, Strauss's counsel was forced to advise the Rodriguez Parties that, with the Court's permission, Strauss was entitled to dispose of any Twinkle inventory remaining on the property if it was not remove on ten days' notice. Debtor's Exhibit 7. At that time, Strauss provided the Rodriguez Parties with an written inventory of the Twinkle goods. Debtor's Exhibits 15, 16.

In fact, it was not until late 2007, that the Rodriguez Parties made arrangements to pick up the Twinkle inventory and then they only took a portion of what was available. Rodriguez Dep. at 14.

Finally, after trial of Strauss's claims, the Supreme Court determined, by memorandum decision, dated February 4, 2009, that Strauss, by virtue of the lease for the Premises that was entered into after the Windsor lease was terminated in October 2006, was entitled to sole possession of the Premises, and judgment was entered in Strauss's favor accordingly. The Court specifically held, in a motion in limine before trial, that because the Windsor Lease had been terminated and Strauss forced to obtain a separate lease through its own efforts after the termination of the Windsor Lease, the issue of whether a binding contract had existed on May 1, 2006 was irrelevant to Strauss's right to possession of the Premises. Facts ¶63; Debtor's Exhibit 74.

The Supreme Court's trial judgment was appealed to the Appellate Division, First Department, on the grounds that the counterclaims and third-party complaint had stated a valid breach of contract claim against Strauss, even though no such claim had been stated in the counterclaim. By Decision and Order, dated December 21, 2010, the Appellate Division affirmed the Supreme Court on the grounds that the Rodriguez Parties had failed to appeal the

dismissal of their counterclaims against Strauss and that this decision was not appealable as part of the final judgment.

By Opinion, dated October 23, 2012, the Court of Appeals reversed the Appellate Division insofar as it found that the dismissal of the Rodriguez Parties' contract claim was not appealable as part of the final judgment and remanded the matter to the Appellate Division for a determination of whether a colorable breach of contract claim against Strauss was stated in the Rodriguez Parties' counterclaim and third-party complaint.

By Decision and Order, dated March 5, 2013, the Appellate Division determined that the Rodriguez Parties had adequately stated a breach of contract claim against Strauss, subject to Strauss's defendants right to contest such claim, and ordered that the matter be remanded to Supreme Court for further proceedings.

By virtue of the prior State Court decisions, it is clear that the only claim remaining to Rodriguez against Strauss is one for breach of contract, which the Appellate Division held was colorable on the face of the Rodriguez pleading, but also recognized has never been judged on the merits or held to be valid.

For the reasons set forth below, it is respectfully submitted that the Rodriguez proof of claim should be rejected in its entirety. There was, in fact, no contract between Strauss and Rodriguez upon which a claim can be based. To the extent that there was an understanding between Strauss and Rodriguez, that understanding was procured through Rodriguez's material misrepresentations and Rodriguez never was able to, and never in fact did, fulfill its obligations under that understanding. Moreover, the amount of damages sought by Rodriguez are insupportable, having no foundation in fact or reality.

**ARGUMENT**

Although a proof of claim is prima facie evidence of the amount and validity of a claim, once Debtor has objected to the proof of claim, the burden then shifts to the claimant to prove the underlying validity and amount of its claim. *See In re St. Johnsbury Trucking Co.*, 206 B.R. 318, 323 (Bankr. S.D.N.Y. 1997); *see also Sherman v. Novack*, 245 B.R. 768 (2d Cir. Bankr. App. Panel 2000). For the reasons set forth below, and as will be further demonstrated at trial, it is respectfully submitted that the Rodriguez Parties cannot meet their burden with respect to either the validity or the amount of their claim.

**I.    NO CONTRACT EXISTED BETWEEN STRAUSS AND THE RODRIGUEZ PARTIES**

Although the Appellate Division held that a colorable claim of breach of contract can be gleaned from allegations in the Rodriguez counterclaim, no finding was made that the claims are actually valid. Indeed, in the very same pleading in which the counterclaims in question were asserted, Rodriguez affirmatively denied that any contract existed between Strauss and Rodriguez.

It is basic contract law in New York that no enforceable contract exists unless there has been a meeting of the minds as to all material terms of the contract. *See Brennan Beer Gorman/Architects, LLP v. Cappelli Enterprises, Inc.*, 85 A.D.3d 482, 483, 925 N.Y.S.2d 25 (1st Dep't 2011). As discussed above, the transaction in question here was not intended to be a "handshake" deal, but was in the process of being documented. The April 26 Draft, relied upon by the Rodriguez Parties was, as described by its author, Allan Maroknek, a "draft." Debtor's Exhibit 9. It was unsigned precisely because it contained terms that Strauss had not agreed to. Specifically, Strauss was not willing to pay Twinkle a commission on all sales, but only on the delivery sales that Twinkle was bringing to the business and Strauss was unwilling to accept

-11-

Twinkle's "perpetual inventory" for valuing inventory, as it was inaccurate and inflated. These are the two largest categories of damages claimed by the Rodriguez Parties in their proof of claim and clearly material.

Equally important, the April 26 Draft expressly conditioned all of Strauss's obligations upon Strauss obtaining a lease from Landlord for the Premises. Facts ¶ 21. It is undisputed that Windsor lost its lease and the Rodriguez Parties lost all right to possession of the Premises -- through their own wrongful conduct -- before Strauss ever obtained a lease to the Premises. Facts 35, 48-50. Under New York law, failure of a condition precedent is fatal to any claim for breach of contract. *See HGCD Retail Services, LLC v. 44-45 Broadway Realty Co.*, 37 A.D.3d 43, 48, 826 N.Y.S.2d 190, 195 (1st Dep't 2006).

## II. THE INDIVIDUAL DAMAGE CLAIMS OF THE RODRIGUEZ PARTIES ARE WITHOUT MERIT

Rodriguez breaks its claim down into seven categories. None of these categories of damages can withstand scrutiny.

<u>Salary for Roberto and Theresa Rodriguez</u>: The Rodriguezes claim to be entitled to the payment of 139 weeks of salary as employees of Strauss. There is no dispute that both Roberto and Theresa Rodriguez were paid their salary for the time they were employed by Strauss. There is also no dispute that they were terminated by Strauss at the end of May 2006. Facts ¶¶ 31-33.

The April 26 Draft is completely silent as to the employment of the Rodriguezes. Debtors' Exhibit 9. There does not appear to be any contractual basis for the Rodriguezes' salary claim at all and on this ground alone it should be denied.

Moreover, in their original proof of claim, the Rodriguez parties sought 52 weeks of salary and later increased it in their amended proof of claim to 139 weeks. Debtor's Exhibits 1-3. At his deposition, Roberto Rodriguez acknowledged that there was, in fact, no agreement for

-12-

the Rodriguezes to be employed by Strauss for any specific term. Rodriguez Dep. 27-28. Likewise, at the deposition, Mr. Rodriguez acknowledged that, at the time he filled out the proof of claim, he had no understanding of how long either he or Teresa was to be employed. Rodriguez Dep. 27-28. It is black letter law in New York that any agreement for employment that is not for a specific term is considered employment at will and can be terminated at any time. *See De Petris v. Union Settlement Ass'n, Inc.*, 86 N.Y.2d 406, 407, 657 N.E.2d 269, 271, 633 N.Y.S.2d 274, 276 (1995) ("Absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party."). Thus, the termination of Roberto and Teresa Rodriguez at the end of May 2006 was entirely proper and Strauss never had any contractual obligation to pay any further salary to them.

Indeed, at his deposition, Roberto Rodriguez testified that he chose 139 weeks of salary in the proof of claim simply because that was how long Strauss continued to pay for the Rodriguezes' health insurance. Rodriguez Dep. at 29-31. However, the record is clear that Strauss paid for the Rodriguezes' health insurance pursuant to a stipulation entered into by the parties after the State Court Action commenced to resolve the issue of possession of the Premises pending a hearing. There was no provision in this stipulation for the Rodriguezes to receive any other employment benefits and certainly not salary. Debtor's Exhibit 72.

Finally, the Rodriguezes were obligated, as a matter of law, to mitigate their damages by finding alternative employment. *Donald Rubin, Inc. v. Schwartz*, 191 A.D.2d 171, 594 N.Y.S.2d 193, 194 (1st Dep't 1993) ("Where there is a breach of a contract for full-time personal services, [t]he actual damage is measured by the wage that would be payable during the remainder of the term reduced by the income which the discharged employee has earned, will earn, or could with

reasonable diligence earn during the unexpired term." (citation omitted)).  Teresa Rodriguez, in fact, found comparable employment as a bookkeeper at another firm and made a salary comparable to the one claimed here.  Debtor's Exhibits 17-19.

In sum, the Rodriguezes' salary claims are entirely lacking any legal or factual foundation.

Value of 1/3 of Siegmund Strauss:  To the extent that there was any enforceable agreement to convey a 1/3 interest in Strauss which, for the reasons discussed above, there was not, no payment is due the Rodriguez parties as a result.  The April 26 draft is very clear that the Rodriguez Parties were to *purchase* an interest in Strauss for 1/3 of its net value.  Debtor's Exhibit 9.  The Rodriguez Parties take the position that 1/3 of the net value of Strauss at the time was $125,000.  The Rodriguez Parties further acknowledge that this purchase price was never paid nor accounted for in any way in their proof of claim.  Rodriguez Dep. 117-27.  In other words, to the extent Rodriguez claims that the value of 1/3 ownership in Strauss was worth $125,000, then Rodriguez was liable pay Strauss $125,000 in return for that interest.  It is a wash and the Rodriguez Parties' net claim is zero.

Purchase of Permanent Fixtures and Leasehold Improvements:  Permanent fixtures and leasehold improvements to the Premises were, under the Windsor lease, the property of the Landlord, not Windsor or Rodriguez.  Debtor's Exhibit 35.  They were not something that Rodriguez could sell or deliver to Strauss and are not a legitimate part of any purported contract damages.

Purchase of Warehouse Equipment: The Rodriguez Parties claim damages for the "purchase of warehouse equipment, furniture, racks, fork lifts, etc."  As will be shown at trial, the equipment, furniture, fork lifts, etc. were either leased or pledged as security to third parties

-14-

and not subject to sale. Rodriguez cannot show an interest in this equipment and thus no basis for claiming a right to recover for such equipment.

Purchase of all Merchandise Inventory: First and foremost, the Rodriguez Parties are not in a position to prove their damages related to the inventory. It will be demonstrated at trial that the "perpetual inventory" maintained by the Rodriguez Parties was inaccurate and grossly inflated. Moreover, the records that exist from the perpetual inventory do not actually show what goods were sold before Strauss arrived on May 1, 2006, only dollar figures for sales. Creditor's Exhibit W. Thus, it is impossible from the record to determine what inventory existed as of May 1, 2006, what was sold after May 1, 2006 by Strauss or what was returned to the Rodriguez Parties. Significantly, the computerized records from which these inventory documents were drawn, and which would allow a determination of these fact, were in the possession of the Rodriguez Parties after this dispute arose, but are no longer available. Rodriguez Dep. at 146.

What will be demonstrated at trial, however, is that when Strauss arrived at the Premises on May 1, 2006, the Twinkle inventory was in poor shape. There were expired food items, broken packaging and mold and dirt, rendering much of the inventory unsaleable and without value. E.g., Debtor's Exhibits 22-26.

Moreover, as with any claim of contract damages, the Rodriguez Parties were obligated to mitigate their damages with respect to their inventory claim. *Holy Properties Ltd., L.P. v. Kenneth Cole Productions, Inc.*, 87 N.Y.2d 130, 133, 661 N.E.2d 694, 696, 637 N.Y.S.2d 964, 966 (1995) ("The law imposes upon a party subjected to injury from breach of contract, the duty of making reasonable exertions to minimize the injury."). Within weeks of a dispute arising, on June 22, 2006, the Rodriguez Parties were invited to remove their inventory from the Premises.

Debtor's Exhibit 5. On July 6, 2008, the Supreme Court invited the Rodriguez Parties to remove their inventory. Rather than retrieve it and try to sell it, the Rodriguez Parties simply asked that it be segregated and retained at the Premises, which was done. Debtor's Exhibit 6. Even after the Rodriguez Parties, on July 13, 2006, entered into a stipulation giving up any right to possession of the Premises pending the preliminary injunction hearing and, on September 19, 2006, after the Supreme Court granted Strauss's request for a preliminary injunction giving Strauss exclusive possession of the Premises, the Rodriguez Parties took no action to retrieve their inventory or mitigate their damages. It was not until December 2006 or January 2007 that the Rodriguez Parties took any steps to find a location to store the inventory and it was not until late 2007 that the Rodriguez Parties picked up the inventory. Rodriguez Dep. at 14-16.

Sales Commissions to Twinkle on All Net Sales: These commissions cannot be asserted on a contract claim. There was no meeting of the minds as to what the sales commission would be. One of the items most seriously in contention during negotiations in May 2006 was whether Twinkle would receive commission on all net sales or only on the delivery sales that Rodriguez was adding to Strauss's existing on site walk in business. Again, without a meeting of the minds, there can be no valid claim that a contract existed, much less for contract damages.

In any event, if commission were due, which it is not, during the period that Roberto Rodriguez operated Twinkle as sales agent on behalf of Strauss -- May 2006 -- the commissions on sales would be negligible, not the enormous sum claimed by Rodriguez.

Finally, as noted above, any contract claim, and especially one for compensation, required mitigation of damages. In this case, Roberto Rodriguez testified at his deposition that, after June 2006, Twinkle was not in business. Rodriguez Dep. at 13. No attempt was made to

15807343v.1

continue or find Twinkle an opportunity to act as a sales agent anywhere else and mitigate the loss of commissions.  Thus, no damages can be assessed against Strauss.

### III.    THERE IS NO BASIS FOR THE CLAIM THAT STRAUSS SPOLIATED EVIDENCE

In the course of this action, the issue has arisen as to whether Strauss, in January or February 2013, by disposing of records older than six years, including receipts showing Strauss cash sales during May 2006, spoliated evidence necessary for this action.  Strauss was able to find, and did produce, its credit and delivery sales receipts for that period.

First, it should be noted that, as of February 2013, this action had not yet been commenced.  Furthermore, the Appellate Division in the State Court Action had not yet acknowledged the existence of any contract claims against Strauss.  Thus, at the time they records were disposed of, there were no claims pending against Strauss.

More important, the Rodriguez Parties vastly overstate the importance of these records.  Significantly, at the second day of deposition of Stanley Mayer, called for the purpose of examining him about these records, Mr. Mayer was questioned about the disposal of the cash sales receipts, yet was not asked one question about the credit and delivery receipts for the same period which do exist and were produced.  Creditor's Exhibit S.

The cash receipts in question would, in fact, show any cash sales that occurred in May 2006, including the item sold, quantity and price.  However, it would not show whether the item sold was from Twinkle inventory or Strauss, whether it was purchased before May 1, 2006 or after May 1, 2006, when Strauss was paying for all purchases.

Indeed, the only accurate way to pinpoint this information would be from Twinkle records. The computerized "perpetual inventory" maintained by Twinkle could generate reports to show all items bought by Twinkle in a given period and all items sold by Twinkle in a given

-17-

period. Thus, with access to these records, one could not only determine what Twinkle had bought, but what had been sold, and therefore what remained for sale, as of May 1, 2006.

However, the reports produced by the Rodriguez Parties do not allow this analysis to be undertaken. Although such reports could be produced, the sales reports produced by the Rodriguez Parties do not show what items were sold. Creditors' Exhibit W. At his deposition, Roberto Rodriguez testified that, although the computerized records were in the Rodriguez Parties' custody and control after the State Court Action commenced, they are no longer available. Rodriguez Dep. at 146. The Rodriguez Parties can only rely on the printed reports that existed when the computerized records were lost or destroyed.

In other words, the documents in question, even if available, would not have been able to establish the identity or amounts of sales of Twinkle inventory. Such facts could have been established if the Rodriguez Parties had (i) been able to produce their computerized purchase and sales records, instead of just select reports and (ii) produced an inventory from their visit to the Premises on June 10, 2006, after the Court expressly provided them with access to the Premises for the purpose of taking an inventory.

Under such circumstances, there is simply no basis for an adverse inference against Strauss concerning facts that would not have been established by the documents that were purportedly "spoliated." *See Alleva v. United Parcel Service, Inc.*, 102 A.D.3d 573, 959 N.Y.S.2d 144 (1st Dep't 2013) (adverse inference awarded for destruction of "critical" evidence and no further sanction in light of the fact same issues could be established through other evidence).

**Conclusion**

For the foregoing reasons, and as will be further addressed at trial, it is respectfully submitted that the Rodriguez Parties Proof of Claim should be dismissed in its entirety.

Dated: New York, NY  
June 25, 2013

Respectfully submitted,

SEYFARTH SHAW LLP

By: _/s/ Ralph Berman_  
Adrian Zuckerman  
Ralph Berman  
620 Eighth Avenue  
New York, NY 10018  
Adrian Zuckerman, Esq.  
Ralph Berman, Esq.  
Telephone: (212) 218-5500  
Facsimile: (212) 218-5526

*Special Litigation Counsel to Siegmund Strauss, Inc.*

BLANK ROME LLP  
The Chrysler Building  
405 Lexington Avenue  
New York, NY 10174  
(212) 885-5000  
Marc E. Richards, Esq.

*Counsel for Siegmund Strauss, Inc.*