**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**                    **NOT FOR PUBLICATION**

In re:

SIEGMUND STRAUSS, INC.,                    Case No. 13-10887 (MG)
                                           Chapter 11

                                  Debtor.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ESTIMATING CLAIM NO. 33
FILED BY ROBERTO AND TERESA RODRIGUEZ, TWINKLE IMPORT CO., INC.
AND WINDSOR BRANDS, LTD.**

*A P P E A R A N C E S:*

JASPAN SCHLESINGER LLP
*Attorneys for Claimants Roberto Rodriguez, Teresa Rodriguez*
*Twinkle Import Co., Inc. and Windsor Brands, Ltd.*
300 Garden City Plaza
Garden City, New York 11530
By:     Shannon Anne Scott, Esq.

SEYFARTH SHAW LLP
*Special Litigation Counsel to Siegmund*
*Strauss, Inc.*
620 Eighth Avenue
New York, NY 10018
By:     Adrian Zuckerman, Esq.
        Ralph Berman, Esq.

BLANK ROME LLP
*Counsel for Siegmund Strauss, Inc.*
405 Lexington Avenue
New York, NY 10174
By:     Mark E. Richards, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

          Pending before the Court is the Debtor's *Motion for Entry of Order (i) to Expunge and*

*Disallow Claim No. 33 Filed by Roberto and Teresa Rodriguez; (ii) Or in the Alternative,*

*pursuant to 11 U.S.C. § 502(c), Estimating Claim No. 33* ("Debtor's Claim Objection," ECF

Doc. # 20).  Claim No. 33 was filed by Roberto Rodriguez and Teresa Rodriguez ("Rodriguezes") on behalf of Twinkle Import Co., Inc. ("Twinkle") and its parent company, Windsor Brands, Ltd. ("Windsor," collectively the "Rodriguez Parties").  The proof of claim was twice amended, first by the First Amended Claim No. 36 and second by the Second Amended Claim No. 40 (collectively, "Claim No. 33").  The amendments reflect increases in the damages sought (*see* ECF Doc. # 28).  The Rodriguez Parties responded to the Debtor's Claim Objection ("Rodriguez Response," ECF Doc. # 27) asserting that Claim No. 33 should be allowed in full.  On May 21, 2013, the Debtor filed a reply to the Rodriguez Response ("Debtor's Reply," ECF Doc. # 29).

The claim asserted by the Rodriguez Parties has been the subject of more than seven years of litigation in New York state courts including: in the Commercial Division in Manhattan, two trips to the Appellate Division, First Department, and one trip to the New York Court of Appeals.  Despite these protracted proceedings in state court, the parties acknowledge, and it is clear to the Court, that allowing the litigation to proceed to judgment in state court would unduly delay administration of the case.  Therefore, the Court determined that estimation of the claim for purposes of voting and distribution is appropriate.  Counsel for the parties agreed with this conclusion and cooperated in establishing the procedures for the estimation hearing.

The Rodriguez Parties filed a pre-trial memorandum ("Rodriguez Pre-trial Memo," ECF Doc. # 39) and exhibit list including stipulated admissions ("Rodriguez's Exhibit List," ECF Doc. # 43).  The Debtor also filed a pre-trial memorandum ("Debtor's Pre-trial Memo," ECF Doc. # 41), a statement of undisputed facts ("Debtor's Statement of Undisputed Facts," ECF Doc. # 42), and an exhibit list ("Debtor's Exhibit List," ECF Doc. # 43).

The Court held the estimation hearing pursuant to section 502(c) of the Bankruptcy Code on July 8, 2013. Counsel agreed that each side would be limited to calling one witness at the hearing, subject to cross-examination in court. The two witnesses, Stanley Mayer ("Mayer") for the Debtor and Roberto Rodriguez ("Rodriguez") for the Rodriguez Parties, were deposed in advance of the hearing, and were examined on direct, cross and re-direct examination during the hearing. Each side also responded to document requests. The Court advised counsel that the hearsay rule would be "relaxed" for purposes of the hearing since only one witness would be presented by each party. The Court allocated six hours for the hearing, divided evenly between the parties, but neither side used the full amount of the allocated time. During the hearing, all of the exhibits offered by the parties were admitted into evidence without objection.[1] After both sides rested, the Court heard argument and took the matter under submission. The Court's findings of fact and conclusions of law pursuant to section 502(c), estimating Rodriguez Parties' Claim No. 33 at $496,265.60 for purposes of allowance and distribution, are contained below.

## I.    BACKGROUND

### A.  Facts

On March 25, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief as a small business under chapter 11. The Debtor also filed a plan and disclosure statement on the Petition Date (ECF Doc. ## 4 and 5). A combined hearing on the disclosure statement and plan has been delayed pending the outcome of the estimation proceeding.

The Debtor operated a wholesale meat market formerly located in the Bronx Terminal Market selling beef, pork, poultry, eggs, butter, cheese, pigs, goats, seafood, groceries,

---

[1]      The Rodriguez Parties trial exhibits are designated with letters, *e.g.*, Ex. A, Ex. B, Ex. C, etc., while the Strauss trial exhibits are designated with numbers, *e.g.*, Ex. 1, Ex. 2, Ex. 3, etc. No trial transcript is available so the Court has relied on its recollection and notes of the trial testimony.

provisions, spices, and institutional and baking supplies, as well as fruits, produce, and various products from Jamaica, West India, and Africa.  Stanley Mayer is the President, Chief Executive Officer and a principal of Strauss.  In March 2004, Strauss was informed that the Bronx Terminal Market's lease with its then landlord had been bought out, and the new landlord wanted to lease the market to various other companies.  Therefore, Strauss was forced to relocate.

In an effort to find a new location, Strauss entered into merger discussions with Twinkle, a similar small business owned by Roberto Rodriguez and his wife, Teresa.  The troubled relationship between Strauss and the Rodriguez Parties has been recounted in several state court opinions, initially in *Siegmund Strauss, Inc. v. E. 149th Realty Corp.*, No. 601991/2006, 2006 WL 2689705 (N.Y. Sup. Ct. 2006) ("Preliminary Injunction Decision," ECF Doc. # 20-4).

Twinkle operated a large facility located at 110 East 149th Street, Bronx, New York (the "Property"), in close proximity to Strauss's former location.  At the time, Windsor was the tenant named on the lease, but Twinkle was paying Windsor rent as a subtenant while operating its business at the Property.  *Id.* at 2-3.  The parties were introduced through a mutual accountant ("Moroknek") because Strauss needed a new location and Twinkle "was on uncertain financial footing and needed some help to stay in business." *Id*. at 3.  As a solution, Moroknek proposed that the two businesses merge and move onto the Property, with Strauss being the surviving entity, and Twinkle and Windsor being dissolved. *Id.*  At the outset of the relationship, Strauss wrote two checks, each for $25,000, for the rent Twinkle owed for February and March 2006.[2] *Id.*  The parties, aided by their mutual accountant, drafted two letter agreements: one between Strauss and Windsor ("Windsor Letter") and the other between Strauss and Twinkle ("Twinkle

---

[2]      The Rodriguez Parties assert that the two payments were intended to provide sufficient value to increase the Rodriguez Parties' security deposit from $100,000 to $150,000 as required by the landlord to effectuate the new lease contemplated by the agreements between the parties.

Letter," and together the "Letter Agreements"). The Letter Agreements were circulated on April 26, 2006, but never signed. *Id.*

The Windsor Letter provided that (i) Strauss would purchase all equipment, furniture, racks, forklifts, etc., for $12,000 and all permanent fixtures and leasehold improvements for $88,000; (ii) Windsor would terminate its business, be dissolved, and use its best efforts to negotiate a new lease between its landlord and Strauss; (iii) Strauss would reimburse Windsor for its $100,000 security deposit; (iv) Strauss would give Windsor its balance sheet as of April 29; and (v) Teresa would purchase a one-third ownership of Strauss based on its net book value on its April 29, 2006 balance sheet. *Id.*

The Twinkle Letter provided that (i) Strauss would purchase Twinkle's inventory of goods at Twinkle's cost as reflected on its books and records; (ii) Twinkle would furnish Strauss with an itemized bill of sale for its inventory; (iii) Twinkle would terminate its business; and (iv) Twinkle would act as Strauss's sales representative, earning a percentage of commission on Strauss's net sales *up to* $300,000 at which point the agreement would be renegotiated. Both letters stated that the agreement would become void if Strauss is unable to obtain a five year lease from Windsor's landlord.

Neither the Twinkle Letter nor the Windsor Letter was ever signed. The last drafts of the letters were prepared on April 29, 2006. Despite the absence of signed agreements, Strauss began moving into the Property in mid-April 2006, and on April 29, 2006, Twinkle used its trucks and employees to help Strauss complete its move into the Property. *Id*. at 4. On May 1, 2006, Twinkle's employees (approximately forty) went to work for Strauss, and the Rodriguezes were placed on Strauss's payroll. *Id.* Strauss also wrote a check for $27,000, dated May 1, 2006, to Windsor's landlord. *Id.*

5

By the third week of May 2006, it was clear that the parties relationship was not working out and Mayer offered to buy out the Rodriguezes. *Id.* at 5. When negotiations fell through, Strauss changed the locks on the Property and prevented the Rodriguezes from entering. *Id.* On June 6, 2006, Strauss also filed a state court action seeking a determination that Strauss was entitled to sole possession of the Property (*see* Ex. L).

On June 10, 2006, pursuant to a stipulation in the state court action, the Rodriguezes were permitted to enter the Property to itemize their inventory, though Rodriguez testified that he was given insufficient time and access to conduct a complete inventory. Furthermore, at a July 6, 2006 hearing before the state trial court, the court advised the Rodriguezes that they could "pick up their inventory, if they choose to do so." (Ex. 6 at 29:16.) However, counsel for the Rodriguezes replied "[w]e are talking about $500,000 worth of inventory that's there, was supposed to be there. Where will we put it if not in our own leasehold," to which the court replied "leave it on the premises until I conduct a hearing." *Id.* On February 16, 2007, Strauss's counsel sent a letter to the Rodriguez Parties' counsel advising that, with the state court permission, Strauss would dispose of Twinkle's inventory if it was not removed from the Property (Ex. 7).

When Strauss moved its inventory into the Property, the Strauss and Twinkle inventories were commingled, at least in part. After the Rodriguez Parties were locked out, Rodriguez testified that Strauss continued to sell Twinkle's inventory as part of Strauss's ongoing business until, at the request of the Rodriguez Parties, the state court directed at the July 6, 2006 hearing that "[t]he Twinkle inventory is not to be sold." (Ex. 6 at 30:3.) Rodriguez based his testimony on his first hand inspection of the Property in compliance with a June 9, 2006 state court order (Ex. M). As explained further below, it is unclear how much of the Twinkle inventory was sold

6

by Strauss, and, apparently there are no clear records currently available documenting these sales. Attached to the February 16, 2006 letter, Strauss provided the Rodriguez Parties with a hand-written itemized list of Twinkle's remaining inventory (Ex. 15 and 16, respectively). The Rodriguez Parties included the information in the hand-written list in an Excel spreadsheet that includes information on the cost basis for the inventory on the list (Ex. 75). In late 2007, the Rodriguez Parties finally removed some but not all of Twinkle's remaining unsold inventory. In January or February of 2013, before this bankruptcy case was filed but while the case was still pending in state court, Strauss disposed of certain of its sales receipts for the years 2006 and 2007, including the May 2006 cash sales receipts which, as discussed below, *may* have been useful in establishing sales of Twinkle's inventory.

### B. Procedural History

At the outset of the state court litigation, both parties moved for temporary restraining orders until their cross-motions for preliminary injunctions to obtain possession of the Property could be heard. The parties entered into a stipulation whereby Strauss agreed to pay the Rodriguez Parties $40,000 for exclusive possession and occupancy of the Property until the hearing on the cross-motions for preliminary injunctions. Preliminary Injunction Decision at 2.

At the preliminary injunction hearing, while the court concluded that there was a likelihood that Twinkle could succeed "on the merits of its claim that specific performance of the oral agreement can be compelled based on the doctrine of partial performance," the court granted Strauss a preliminary injunction. *Id*. at 8-9. The court reasoned that only Strauss could show irreparable injury because it was the only party currently operating a business at the Property. Conversely, the Rodriguez Parties could be adequately compensated by money damages because (i) the Rodriguez Parties were willing to enter into the $40,000 stipulation granting Strauss

7

exclusive possession of the property for a limited period, and (ii) in a simultaneous action

brought in New Jersey, which was ultimately voluntarily dismissed, the Rodriguez Parties were

only seeking money damages and did not challenge Strauss's possession. *Id.* at 8-9. With

respect to the balance of equities, the Court noted that, despite not entering into the Letter

Agreements, Strauss benefited from the arrangement contemplated in the Letter Agreements by

(i) using Twinkle's trucks and labor to move in, (ii) selling some of Twinkle's inventory, and

(iii) selling to Twinkle's former clients. Meanwhile, Strauss never sold a one-third share to

Teresa, never returned Windsor's security deposit on the Property (though it was subsequently

returned), and failed to pay for Twinkle's equipment, fixtures, and inventory, as contemplated by

the Letter Agreements. Furthermore, the court stated that "Strauss also does not seem to have

tried very hard to make the relationship with the Rodriguezes work. After negotiating the deal

with the Rodriguezes over the first four months of 2006, Stanley asked them to leave just three

weeks after moving into the property. Within two more weeks, the Rodriguezes had been fired."

*Id.* at 9. In dicta, the court also opined that "[a]ll of this conduct would be highly relevant if the

question before me were whether to award damages to either party." *Id.*

    In answering Strauss's complaint seeking a declaratory judgment for possession of the

Property, the Rodriguez Parties asserted counterclaims (the "Rodriguez Counterclaims") and a

third-party complaint against Strauss's principals. The Rodriguez Parties alleged fraud,

conversion and tortious interference. Strauss and its principals moved to dismiss certain of the

counterclaims. The state court granted the motion to dismiss because the court believed the

Rodriguez's claims, if valid, arose out of breach of contract as opposed to claims sounding in

fraud. After Strauss filed its note of issue, the Rodriguez Parties moved for leave to amend their

answer to include claims for breach of contract against Strauss and its principals, but the trial court denied the motion as untimely.

By memorandum decision dated February 4, 2009, the trial court granted Strauss a declaratory judgment granting it possession of the Property and declaring that the Rodriguez Parties had no interest in the Property.  (*See* ECF Doc. # 20-6.)  The decision granting Strauss exclusive possession of the Property was based on the fact that after the state court granted Strauss a preliminary injunction, the landlord terminated Windsor's lease because Windsor had violated the terms of the lease by improperly subletting a portion of the Property to a third party. The landlord then entered into a new lease with Strauss, giving Strauss the sole right to occupy the Property.[3] *See id.* at 6.

The Rodriguez Parties appealed from the final judgment, but did not appeal the interlocutory orders denying their motion to amend and dismissing the Rodriguez Counterclaims. The Appellate Division held that the Supreme Court's disposition of the motion to amend and the Rodriguez Counterclaims had become final and non-appealable after it had granted the relief Strauss sought in its complaint.  *Siegmund Strauss, Inc. v. E. 149th Realty Corp.*, 919 N.Y.S.2d 1, 6 (N.Y. App. Div. 2010).   On October 23, 2012, the New York Court of Appeals reversed the First Department, holding that the orders denying the motion to amend and dismissing the counterclaims were not final and non-appealable; therefore, the court directed, on remand to the First Department, that the court should consider whether the Rodriguez Parties had alleged colorable claims for breach of contract.  *Siegmund Strauss, Inc. v. E. 149th Realty Corp.*, 980 N.E.2d 483, 487 (N.Y. 2012).  Thereafter, the First Department held that the Rodriguez Parties

---

[3]        Rodriguez testified that Strauss was aware of the sublet to a third party, which began months before Strauss moved onto the Property.

had alleged facts sufficient to support contract-based claims. *Siegmund Strauss, Inc. v. E. 149th Realty Corp.*, 960 N.Y.S.2d 404, 406 (N.Y. App. Div. 2013). The case was then returned to the trial court, but this bankruptcy case was filed staying any further action in state court.

On April 26, 2013, the Rodriguez Parties filed Claim No. 33 in the bankruptcy case, which, after being amended twice, seeks damages in the amount of $1,361,515.00. The twice amended proof of claim includes the following:

1. Purchase of Warehouse equipment, furniture, racks, forklifts, etc.….$12,000.00
2. Purchase of permanent fixtures & leasehold improvements………...$88,000.00
3. Purchase of all merchandise inventory…………………………..$530,715.00
4. Sales Commissions on all net sales………………………………$300,000.00
5. Salary compensation for Roberto Rodriguez (139 weeks).………..$194,600.00
6. Salary compensation for Teresa Rodriguez (139 weeks) ………….$111,200.00
7. Value of 1/3 ownership of Strauss (As of April 30, 2006)………...$125,000.00
                                                    Total Amount of Claim…...…$1,361,515.00

Rodriguez Pre-trial Memo at 6.

### C.  Rodriguez Parties' Arguments

The Rodriguez Parties argue that they entered into enforceable agreements with Strauss in May 2006, which, while never signed, were consummated through partial performance, including, *inter alia*, permitting Strauss to move onto the Property and providing trucks, employees, forklifts and warehouse equipment to help with the move. The Rodriguezes were also placed on Strauss's payroll, as contemplated in the Letter Agreements. While acknowledging that the agreements contained a condition that Strauss be able to obtain a new five year lease from Windsor's landlord, the Rodriguez Parties point to a May 17, 2006 email from Windsor's landlord to Strauss's counsel attaching the new lease and requesting that all parties execute the agreement. (Ex. K.)

The Rodriguez Parties allege that Strauss breached the agreements by failing to pay the agreed price, and owe contractual damages as a result. As per the alleged agreements, Strauss

was to purchase all warehouse equipment, computer equipment, and other office equipment and personal property from Windsor for $12,000 and all fixture and leasehold improvements from Windsor for $88,000. *See* Statement of Undisputed Facts, ¶ 18(a). The Rodriguez Parties assert that Moroknek determined these values in an effort to have Strauss pay a relatively low sales tax on the sale of the equipment (among other things); however, it was understood that the Rodriguezes were to be compensated for Strauss's purchase of the equipment at a discount by other terms incorporated in the agreement. Teresa was to pay $125,000 for the one-third share of Strauss; however, according to Rodriguez, the $125,000 was never anticipated to be paid because Strauss owed the Rodriguezes $100,000 in reimbursements for the Windsor security deposit (which was eventually returned) and $12,000.00 and $88,000.00 due for the purchase of the warehouse equipment, furniture, racks, fork lifts, and the permanent fixtures and leasehold improvements. Further, again according to Rodriguez, Moroknek included the $300,000.00 commission to be paid by Strauss to the Rodriguezes as part of the consideration to compensate the Rodriguezes for the value it would lose in relinquishing the Property to Strauss.

The Rodriguez Parties also argue that the Debtor should be precluded from challenging the value of their inventory remaining in the warehouse as of May 1, 2006 (asserted at $530,715.00) because the Debtor either willfully or negligently disposed of the cash sales records for the relevant period, despite pending state court litigation in which the receipts were relevant. The Rodriguez Parties argue (and the Court concludes below) that the cash sales records would have helped the Rodriguez Parties prove the value of their inventory that was sold by Strauss and the amount of commissions they were entitled to be paid. The Rodriguez Parties not only request an adverse inference, but also attorney's fees associated with briefing the spoliation issues.

11

### D. Debtor's Arguments

The Debtor argues that the Rodriguez Parties cannot establish that a valid enforceable contract existed between Strauss and the Rodriguez Parties because obtaining a new five year lease was an express condition precedent to all of Strauss's purported obligations, which was never met.[4]  Strauss also asserts there never was a meeting of the minds, which is why the agreements were never signed.  Strauss alleges there were still unresolved issues; including (i) whether Strauss was willing to pay Twinkle a commission on all sales or just delivery sales and (ii) Strauss's unwillingness to accept Twinkle's "perpetual inventory" valuation of its goods (as described below).

Even if there was a contract, the Debtor argues there was no breach, and if there was a breach, the Rodriguez Parties cannot meet their burden of proof on damages.  Lastly, the Debtor argues that the Rodriguez Parties failed to mitigate any theoretical damages.  The Debtor also accuses the Rodriguezes of self-dealing, failing to pay back two $25,000 loans made to Twinkle for February and March 2006 rent, and making material misstatements about Twinkle's financial stability while the Letter Agreements were being negotiated.  Even if there was a valid agreement, the Debtor has asserted various arguments why the damages asserted by the Rodriguez Parties are improper.

Purchase of all Merchandise Inventory:  The Debtor alleges that the Rodriguez Parties' inventory estimates are overstated because Twinkle did not regularly perform physical counts of its inventory, and instead relied on "perpetual inventory," meaning that Twinkle would add the

---

[4]    Strauss ignores the fact that it did ultimately obtain a new lease from Windsor's landlord for a term of more than five years, satisfying the condition in the Letter Agreements.  The Letter Agreements are silent about the time period within which the condition must be satisfied and do not require that Windsor be the leaseholder at the time Strauss obtained a new lease.

volume of inventory purchases and subtract the volume of sales.[5]  According to Strauss, this

calculation is not accurate because, upon inspection of the goods, much of the inventory was in

very poor condition and/or expired, meaning it was unsellable (depreciating its value).[6]  For

support, the Debtor submitted photographs taken of the warehouse showing broken boxes and

expired cheese and hot dogs (Ex. 45), a letter from the U.S. Department of Agriculture addressed

to Twinkle stating that 1,800 pounds of meat handled by Twinkle had been improperly stored

and could not be sold (Ex. 48),[7] and a letter from a food bank evidencing donation of food that

was allegedly unable to be sold (Ex. 67).[8]  The Debtor also believes Twinkle failed to mitigate

any damages by refusing to pick up the inventory when permitted.

Salary for the Rodriguez Parties:  The Debtor disputes whether the Rodriguezes are

entitled to payment of 139 weeks of salary.  Mayer testified that the Rodriguezes were

employees of Strauss and were paid for the time they were employed.  The Debtor argues that

because the Rodriguezes were at will employees (a contention admitted by the Rodriguez

Parties' counsel during the estimation hearing), Strauss does not owe them any salary for the

period after they were no longer with the company.  The Letter Agreements were silent as to the

Rodriguezes' employment and no set term of employment was ever specified.  The 139 week

calculation is impermissible because it is based on the amount of time Strauss continued to pay

---

[5]       Rodriguez testified that Twinkle used a modified FIFO ("first-in, first-out") method of computing the value
of inventory.

[6]       Rodriguez testified that Twinkle regularly adjusted its inventory figures to reflect reductions in inventory
(and value) for damaged or spoiled products.

[7]       Rodriguez testified that the damage to the meat was caused by Strauss's move onto the Property.  The
parties dispute whether the damaged meat belonged to Strauss or Twinkle.

[8]       Mayer testified that Roberto Rodriguez, at the time, asserted the donated goods could still be sold.

for the Rodriguezes' health insurance pursuant to a state court stipulation limited to the payment of health insurance.

Value of one-third of Strauss:  The Debtor argues that the Rodriguezes are not entitled to one-third of the value of Strauss's equity at the relevant time period (valued at $125,000) because Teresa never purchased that equity, as was required by the Letter Agreements.  Thus, for the Rodriguezes to have a right to the $125,000, the same amount would have to be paid to Strauss, meaning the payments would cancel each other.  Needless to say, Teresa has no interest in paying $125,000 for the now-worthless equity in Strauss.

Purchase of Fixtures and Leasehold Improvements and Purchase of Warehouse Equipment:  The Debtor argues that no money is owed to Twinkle or the Rodriguezes for the fixtures and leasehold improvements purchased by Strauss because the fixtures and leasehold improvements were property of the landlord under Windsor's lease, and therefore not able to be conveyed by any of the Rodriguez Parties.  For support, the Debtor points to Exhibit 35 (the entire Windsor lease), without pointing to a specific provision for support.  The Debtor argues that no damages are owed for the purchase of warehouse equipment because most of the equipment was either leased or pledged as security to a third party.[9]

Sales Commissions:  The Debtor argues that it owes no damages for unpaid sales commissions because there was no meeting of the minds whether Twinkle would receive a commission on all net sales or only the delivery sales, thus no valid contractual damage claim exists.  The Debtor also asserts that, even if there was a damage claim for unpaid sales

---

[9]    Mayer testified that Strauss continued to use the equipment and leasehold improvements remaining on the Property, but never paid any money towards servicing the debt on the loan which the equipment collateralized. Rodriguez testified that he remains personally liable for the $100,000 owed to the bank, and is currently being sued for nonpayment.

commissions, they would only include sales for May 2006 (while the Rodriguezes were employed by Strauss) and such claim would be negligible.

<u>Spoliation</u>:  With respect to spoliation, Strauss argues that as of February 2013, when the documents were discarded, the bankruptcy case had not yet commenced and the Appellate Division had not yet concluded that the Rodriguez Parties had asserted colorable contract claims against Strauss—although the Court of Appeals had already reversed the Appellate Division and remanded the issue whether the Rodriguez Parties maintained colorable contract claims. Furthermore, the Debtor argues that the Rodriguez Parties vastly overstate the importance of the records because the cash receipts would show that an item was sold, but not whether it was sold from Twinkle or Strauss inventory.  The Debtor also argues that the Rodriguez Parties were in possession of computer records that could adequately reflect their inventory as of May 1, 2006, but chose to abandon the tapes years ago.

## II.    DISCUSSION

### A.    Estimation of the Claim

Section 502(c) states:

> (c) There shall be estimated for purpose of allowance under this section—
>
> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
>
> (2) any right to payment arising from a right to an equitable remedy for breach of performance.

11 U.S.C. §502(c).

"Section 502(c) of the Bankruptcy Code permits the bankruptcy court to use streamlined procedures for resolving disputed claims."  *Bayerische Landesbank v. Deutsche Bank AG, et al*

*(In re Residential Capital, LLC)*, 488 B.R. 565, 577 (Bankr. S.D.N.Y. 2013); *see also* 4 COLLIER ON BANKRUPTCY ¶ 502.04 (16th ed. 2012) ("Section 502(c) provides a mechanism for estimating the amount of a contingent or unliquidated claim for purpose of its allowance when the fixing or liquidation of the claim as determined by the court would unduly delay the administration of the case.").  "But neither the Code nor the Federal Rules of Bankruptcy Procedure provides any procedures or guidelines for estimation, and a bankruptcy court has wide discretion in accomplishing it." *In re Chemtura Corp.*, 448 B.R. 635, 648-49 (Bankr. S.D.N.Y. 2011).  The court is only "bound by the legal rules that may govern the ultimate value of the claim." *Id*. at 469.

### B.    Presence of a Valid Contract

Before the Court can determine the proper value of the claim, it must first determine whether the parties had entered into an enforceable contract, despite there being no signed agreement between the parties.

A "contract may be valid even if it is not signed by the party to be charged, provided its subject matter does not implicate a statute—such as the statute of frauds (General Obligations Law § 5-701)—that imposes such a requirement." *Flores v. Lower E. Side Serv. Ctr., Inc.*, 4 N.Y.3d 363, 368 (2005).  New York's General Obligations Law § 5-701, in relevant part, states:

> a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> > 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime.

N.Y. Gen. Oblig. Law § 5-701 (McKinney).

"An agreement must be in writing if, by its terms, it is incapable of being performed within one year from its making or if its performance cannot be completed before the end of a lifetime (General Obligations Law § 5–701[a][1] )." *Hill v. Coates*, 911 N.Y.S.2d 294, 295 (N.Y. App. Div. 2010).  Furthermore, New York's General Obligations Law § 5-703, in relevant part, states:

> 2. A contract for the leasing for a longer period than one year, or for the sale, of any real property, or an interest therein, is void unless the contract or some note or memorandum thereof, expressing the consideration, is in writing, subscribed by the party to be charged, or by his lawful agent thereunto authorized by writing.

N.Y. Gen. Oblig. Law § 5-703(2) (McKinney).

Here, the alleged contract between Strauss and the Rodriguez Parties does not fall within the statue of frauds because all of the provisions of the Letter Agreements could conceivably be completed within one year.  Furthermore, the Letter Agreements were not contracts for the leasing of real property; the Letter Agreements only provided that Strauss's inability to obtain a new five year lease under a separate agreement with Windsor's landlord would void the agreement.

To create a binding and enforceable contract, "there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.,* 715 N.E.2d 1050, 1053 (N.Y. 1999).  There must be "an objective meeting of the minds . . . ." *Id.* "[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 417 N.E.2d 541, 543 (N.Y. 1981).

The existence of a binding contract is not dependent on the subjective intent of the parties but rather on "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Const. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977). An *unsigned* contract may be enforceable when objective evidence establishes the mutual intent of parties to be bound. *Flores v. Lower E. Side Serv. Ctr., Inc.*, 828 N.E.2d 593, 597 (N.Y. 2005).

Such objective evidence includes the parties' performance in accordance with the terms of the agreement. *See Flores*, 4 N.Y.3d at 366 (finding an unsigned contract enforceable where a subcontractor assumed the role of general contractor, performing "the work specified in the contract" and being "paid in conformity with the documents"); *see also Brighton Inv., Ltd. v. Har-ZVI*, 932 N.Y.S.2d 214, 216 (N.Y. App. Div. 2011) (finding an exchange of emails, in the absence of executed documents, as constituting an enforceable contract "when communications are sufficiently clear and concrete to establish such an intent") (citations and internal quotation marks omitted).

Where there is a dispute regarding an unsigned contract, the resolution does not necessarily depend on whether the document in question was actually signed or "on any other 'single act, phrase or other expression,' but on whether the parties' words and deeds establish their intent to enter into a binding agreement 'given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain.'" *Brighton*, 932 N.Y.S.2d at 216 (quoting *Brown Bros.*, 361 N.E.2d at 1001).

Here, there is sufficient objective evidence to prove the parties intended to enter into a contract premised on the material terms of the Letter Agreements.[10]  Indisputably, both parties began to perform under the terms of the Letter Agreements, which had been negotiated by the parties' mutual accountant over several months.  Twinkle assisted Strauss in moving its business onto the Property, and Twinkle employees, including the Rodriguezes, began working directly for Strauss.  Likewise, Strauss started acting as if the Rodriguez Parties and Strauss had merged, even listing Teresa Rodriguez as a one-third owner on its application for a Perishable Agricultural Commodities Act license (Ex. E).  Strauss also started writing checks for Windsor's rent and/or to supplement Windsor's security deposit, and started repairing and improving the Property's facilities.  These actions were taken with the acquiescence and cooperation of both parties.  It is inexplicable why the parties would take such actions in the absence of an agreement.  Moreover, both parties were motivated to enter into the agreement because Strauss was being forced to relocate and was seemingly well capitalized (at the time) while Twinkle was in possession of a warehouse but was having financial difficulties.

The Debtor disputes that there was an enforceable contract and argues that terms of the Letter Agreements were disputed, which was the reason they were never signed.  Specifically, Strauss argues that the parties never agreed on (i) whether the sales commissions would apply to all sales or just delivery sales, and (ii) the valuation of Twinkle's inventory.  However, it is not clear from the Letter Agreements or elsewhere in the record, aside from Mayer's testimony

---

[10]        In 2006, in the context of a motion for a preliminary injunction, Justice Fried opined that, based on evidence and testimony taken, the Rodriguez Parties were likely to succeed on the merits to "demonstrate at trial that the parties had reached an agreement as to the material terms" of the Windsor Letter and Twinkle Letter, and the Rodriguezes would "prevail on the merits of its claim that the oral agreement is enforceable based on the doctrine of partial performance."  Preliminary Injunction Decision at 5, 7.  There is no preclusive effect from this prior decision, but it is nevertheless instructive.

which Rodriguez's testimony refutes, that these terms were disputed *at the time* Strauss and the

Rodriguezes began performing under the Letter Agreements.  Strauss cannot accept all of the

benefits of the Letter Agreements and assert that it never assumed any of its obligations under

the agreements.[11]

The Debtor also argues that there was no contract because a condition precedent that

Strauss obtain a five year lease from Windsor's landlord was never satisfied.  The Letter

Agreements provided that "[t]he entire Agreement is dependent on and subject to Strauss

obtaining a lease from Windsor's landlord (East 149th St Realty Corp) for a minimum of a five

(5) year term at a rent agreed upon between them.  If Strauss is unable to obtain the same, then

this Agreement is void and we will have to renegotiate our arrangement."  It is disingenuous for

the Debtor to rely on this provision of the agreements because, after the Windsor lease was

terminated, Strauss entered into a new lease for the period October 21, 2006 to April 30, 2012—

a lease for more than five years.  (*See* ECF Doc. # 20-6 at 6.)  While the Debtor argues that the

condition had to be satisfied prior to Windsor losing its lease, the Letter Agreements are silent

about such a requirement.  Furthermore, on May 17, 2006, prior to termination of the Windsor

lease, the landlord's counsel sent Strauss's counsel an email containing the new Strauss Lease,

but Strauss never signed the documents.  (Ex. K.)  Strauss could have entered into the new lease

prior to the termination of the Windsor lease, but chose not to do so and instead prevented the

---

[11]    There is a certain irony in the parties' positions taken in the state court and here on the issue of whether
there were binding agreements between the parties on the terms set forth in the Letter Agreements.  In the state
court, in moving to dismiss the Rodriguez Parties' tort counterclaims, Strauss argued there was a binding oral
agreement which precluded the Rodriguez Parties from asserting their tort claims.  The Rodriguez Parties took the
opposite position, arguing that there was no contract and, therefore, they could assert their tort claims.  Justice Fried
concluded that Strauss had established probability of success in proving the existence of a binding oral agreement,
and on that basis dismissed the tort claims.  For purposes of the estimation proceeding, the Court determines that the
unsigned Letter Agreements set forth the terms of the parties' oral agreement.

Rodriguezes from entering the property and started renegotiating with the Rodriguez Parties'
landlord without them.

The Court concludes that the parties exhibited an objective manifestation of mutual
assent and intent to be bound by the Letter Agreements, which is inferred from the parties'
substantial performance in conformity with the material terms of the Letter Agreements.  Thus,
the parties entered into a valid enforceable contract under the material terms of the Letter
Agreements.  Moreover, it is clear from the record that Strauss did not comply with its
obligations under the Letter Agreements in breach of the contract.

### C.    Damages

The burden of proving a breach of contract and resulting damages is on the plaintiff
except in cases where the defendant asserts the breach as grounds for affirmative relief or as an
affirmative defense.  12 C.J.S. *Contracts* § 947.  "To establish a *prima facie* case for breach of
contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that
contract; and (3) damages resulting from the breach."  *RIJ Pharm. Corp. v. Ivax Pharms., Inc.,*
322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004); *see also Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
392 F.3d 520, 525 (2d Cir. 2004); *First Investors Corp. v. Liberty Mut. Ins. Corp.,* 152 F.3d 162,
168 (2d Cir. 1998).

Once the plaintiff has met its burden of proving a breach of contract, the "burden is upon
the party whose wrongful act caused the damages complained of to prove . . . that the damages
were lessened or might have been lessened by reasonable diligence on the part of the aggrieved
party."  R.P. Davis, Annotation, *Presumption and Burden of Proof Regarding Mitigation of
Damages*, 134 A.L.R. FED. 242 (1941).  "The burden of proving that the damages which have
been sustained in such cases could have been prevented, unquestionably rests upon the party

guilty of the breach of contract." *Losei Realty Corp. v. City of New York*, 171 N.E. 899, 902

(N.Y. 1930) (*quoting Hamilton v. McPherson*, 28 N.Y. 72, 77 (1863)).

   1. *Spoliation*

   As a result of the Debtor's destruction of its May 2006 cash receipts, the Rodriguez

Parties request that the Debtor be charged with an adverse inference, arguing that when coupled

with credit and delivery receipts, the cash receipts could have proven the quantity of the Twinkle

inventory sold by Strauss in May 2006. The Rodriguez Parties request that the Court preclude

Strauss's evidence that seeks to disprove the value of the Rodriguez Parties' inventory carried on

Twinkle's books at a cost of $530,715.00.[12]

   Spoliation is "the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999). "The determination of

an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial

judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d

423, 436 (2d Cir. 2001).

   The spoliation of evidence relevant to prove an issue at trial can support an adverse

inference that evidence would have been unfavorable to the party responsible for its destruction.

*Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998). A party seeking an adverse

inference instruction or sanction must establish three elements: (1) the party responsible for the

evidence's destruction had an obligation to preserve it at the time it was destroyed, (2) the

evidence was destroyed with a culpable state of mind, including ordinary negligence, and (3)

---

[12]      The Rodriguez Parties also seek payment of expenses for lawyer's fees incurred researching and briefing
the spoliation issue, which the Court declines to grant.

such evidence would be relevant to the party's claim or defense so that a reasonable trier of fact could find that it would support that claim or defense. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430-31 (S.D.N.Y. 2004) ("*Zubulake*").

When evidence is destroyed in bad faith (i.e., intentionally or willfully), the Second Circuit considers that fact alone sufficient to demonstrate relevance. *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 108 (2d Cir. 2002). When evidence is destroyed negligently, the party seeking an adverse inference instruction or sanction must prove the relevance. *Id.* at 109. In cases of negligence or recklessness, the corroboration requirement is necessary because "it cannot be inferred from the conduct of the spoliator that evidence would even have been harmful to him." *Id.* (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 77 (S.D.N.Y. 1991)).

Once a party reasonably anticipates litigation, it has a duty to suspend routine document destruction and establish a "litigation hold" to ensure the preservation of relevant documents. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("*Zubulake IV*"). The responsible party's duty to establish a litigation hold does not end its discovery obligations. Additionally, "counsel must oversee compliance . . . monitoring the party's efforts to retain and produce the relevant documents." *Zubulake* 229 F.R.D. at 432. In *Voom HD Holdings LLC v. EchoStar Satellite LLC.*, 939 N.Y.S.2d 321 (N.Y. App. Div. 2012), the court applied the *Zubulake* standard of preservation, noting that it is "widely adopted by federal and state courts," and "harmonious with New York precedent in the traditional discovery context . . . ." *Id*. at 324. Therefore, the same standard applies for spoliation of documents before this bankruptcy case was filed and the case was still pending in state court.

The party against whom a spoliation sanction is sought may rebut the presumption of relevance by "by demonstrating that the innocent party had access to the evidence alleged to have been destroyed or that the evidence would not support the innocent party's claims or defenses." *Id.* at 331 (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 468-69 (S.D.N.Y. 2010) (abrogated on other grounds by *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)).

It is undisputed that in either January or February 2013 Strauss discarded the May 2006 cash sales receipts, after the New York Court of Appeals remanded the case back to the Appellate Division to determine whether the Rodriguez Parties' breach of contract claims were colorable.  In other words, the breach of contract claim was very much still alive when Strauss destroyed the records.  The First Department thereafter concluded that the breach of contract claims were colorable and, but for Strauss's bankruptcy filing, the breach of contract claims would have proceeded in the trial court.

The Court need not decide whether Strauss willfully discarded the sales receipts because the Court concludes that, at a minimum, Strauss was negligent in destroying the records.  The receipts were relevant to the damages Twinkle asserted for its breach of contract claim with respect to (i) Strauss's failure to purchase Twinkle's inventory and (ii) Strauss's failure to pay Twinkle certain sales commissions.

With respect to the first *Zubulake* element, Strauss had an obligation to preserve the receipts because it was engaged in litigation at the time it discarded the receipts.  Strauss argues that it was not put on notice of the litigation because there were no claims pending against Strauss at the time of the disposal since, as of February 2013, the bankruptcy had not been filed and the Appellate Division had not acknowledged the existence of any contract claims against

24

Strauss.  However, Strauss and Mayer knew that there was ongoing litigation, which had already spanned seven years, and, as already noted, in October 2012 the New York Court of Appeals remanded the matter back to the First Department to determine whether the Rodriguez Parties' breach of contract claims were colorable.

Second, the Court need not decide whether Strauss discarded the receipts in bad faith because there is sufficient evidence to support a conclusion that Strauss was negligent.  Strauss maintained the records for seven years while it was embroiled in litigation, and knew or should have known that after the New York Court of Appeals' decision, the Appellate Division would soon decide whether the Rodriguez Parties had sufficiently asserted breach of contract claims. Strauss provides no reason or explanation for the disposal of the sales receipts, other than its belief that they were old and no longer needed.  Other similar documentation, delivery and credit card receipts from May 2006, were organized and placed in storage.

Lastly, the receipts were relevant to the Rodriguez Parties' breach of contract claims because they are informative as to the type and quantity of goods sold on a walk-in cash basis during the relevant time period.  Mayer testified that a majority of cash sales were recorded using handwritten sales receipts; no computer records of such sales are available.  If the sales receipts existed, the Rodriguez Parties may well have been able to offer evidence of Strauss's sales of Twinkle inventory in May of 2006.  This is relevant to the value of Twinkle's inventory as of May 1, 2006 and the percentage of unpaid commissions Strauss owes the Rodriguezes.[13]  Thus, the destroyed documents bear directly upon the issue of damages and likely would have been offered into evidence.

---

[13]     While Mayer testified that there was a disagreement whether the Rodriguezes would only receive a commission on delivery sales, the Rodriguezes' claim asserts damages for a percentage of all net sales.

Strauss claims that the destroyed documents in question, even if available, would not have been able to establish the identity or amounts of sales of Twinkle inventory. According to Strauss, the cash receipts would show cash sales over the contested period, including the item sold, quantity, and price; however, they would not show whether the item sold was from Twinkle's inventory or Strauss's inventory or whether it was purchased before May 1, 2006 or after May 1, 2006, when Strauss was paying for all purchases. While both Twinkle and Strauss sold some of the same products, there were also differences, including for example the brand of cheese or other products that each party carried in inventory and sold. A sales receipt showing a description of the item sold may well have revealed whether the product was from the Twinkle or Strauss inventory. The cash receipts were obviously relevant to determining Strauss's overall sales for purposes of calculating the sales commissions. As a result of Strauss's negligence in disposing of the receipts, the Court concludes that the Rodriguez Parties have met their burden of establishing the relevance of the cash receipts that Strauss destroyed.

Strauss attempts to shift the blame to the Rodriguez Parties. Strauss alleges that the only accurate method for computing the value of the inventory would be from Twinkle's own computerized records of its perpetual inventory, but the reports produced by the Rodriguez Parties are incomplete. Strauss also notes that although the computerized records were in the Rodriguezes' possession after the commencement of the state court action, they are no longer available.[14]

Strauss should have reasonably anticipated the breach of contract litigation as early as October 2012 when the Court of Appeals handed down its decision, two or three months *before*

---

[14]    As the Court commented during the estimation proceeding, neither party has acquitted itself particularly well with respect to records retention. The only document retention issue squarely presented to the Court and decided herein is the spoliation assertion with respect to Strauss's destruction of the sales receipts.

it disposed of the cash receipts.  Before the Court of Appeals remanded the breach of contract

issues, Strauss made no effort to discard the relevant 2006 records.  Disposal of the records after

the Court of Appeals' decision was at least negligent.  Therefore, to the extent that Strauss would

not otherwise have the burden to disprove the damages asserted by the Rodriguez Parties to

which the cash receipts relate—specifically the purchase of merchandise inventory and the sales

commission—the Court places the burden on Strauss.

### 2.  *Value of One-Third of Strauss*

The Rodriguez Parties are not entitled to the $125,000 sought for Strauss's failure to sell

Teresa Rodriguez a one-third interest in Strauss.  To be entitled to such equity (which currently

has little or no value), Teresa would have to pay Strauss $125,000 under the agreement,

something she is (not surprisingly) unwilling to do.  At this stage, it is irrelevant whether Teresa

was ever *expected* to provide the $125,000 to Strauss, since the Rodriguez Parties would have

received payments from Strauss (which Strauss never made) in excess of $125,000 that could

have provided the source of funds for the payment of the equity without Teresa actually having

to go out of pocket.  The Letter Agreements specified the amount Teresa was to pay for the

equity.  Teresa did not pay for it so it cannot form any part of the recoverable damages; if she

had paid for it, it would now, in all likelihood, be worthless.

### 3.  *Salary for the Rodriguez Parties*

The Rodriguez Parties are not entitled to the damages Roberto and Teresa are seeking

($194,600 and $111,200, respectively) for unpaid salary.  Both Roberto and Teresa were

compensated for all work performed prior to termination of their employment.  *See* Debtor's Pre-

trial Memo at 12.

The Letter Agreements are silent about the term of the Rodriguezes' employment (aside from a paragraph relating to sales commissions for which the Rodriguezes are seeking damages separately), and the Rodriguezes' counsel conceded during the estimation hearing that the Rodriguezes were at will employees.  Under New York law, an agreement for employment that is not for a specific term is considered employment at will and can be terminated at any time. *See De Petris v. Union Settlement Ass'n, Inc.*, 657 N.E.2d 269, 271 (N.Y. 1995) ("Absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party.").  Rodriguez made clear in his deposition that there was no particular time period for which he was supposed to be employed at Strauss.  (Ex. 44 at 27-28.)  Therefore, because the Rodriguezes were at will employees, their termination did not breach the Letter Agreements and no damages are owed.

    4.   *Purchase of Fixtures and Leasehold Improvements and Purchase of Warehouse Equipment*

The Letter Agreements provided that Strauss will purchase for $12,000 "all of the warehouse equipment, computer equipment and software, office furniture, office supplies, warehouse supplies warehouse shelving and racks, forklifts, hi-los, and any other miscellaneous personal property . . . owned by Windsor on May 1, 2006."  Furthermore, the Letter Agreements provided Strauss shall purchase for $88,000:

> [a]ll fixtures permanently attached to the reality and becoming part thereof and leasehold improvements installed and owned by Windsor in the warehouse building located at . . . [the Property] shall be purchased by Strauss on May 1, 2006. Said items shall include but are not limited to: refrigerator and freezer boxes, new roof, bathroom fixtures, cashiers booths, entrance doors, all plumbing and electrical installations, cement and masonry work done in the building by Windsor, and any other leasehold improvements and fixtures not specifically set forth herein but owned by Windsor on May 1, 2006.

*Id.* at 4.

Neither the $12,000 nor the $88,000 was ever paid to the Rodriguez Parties, despite Strauss's use of the equipment, fixtures and leasehold improvements to the exclusion of the Rodriguez Parties.  Roberto Rodriguez remains personally liable on a $100,000 loan from HSBC used to purchase the equipment, fixtures and leasehold improvements.

The Debtor argues that it does not owe $12,000 for warehouse equipment because a majority of the equipment was either leased or pledged as security to third parties.  The Debtor also argues that it does not owe $88,000 for permanent fixtures and leasehold improvements because, pursuant to Windsor's lease (Ex. 35), such property belonged to Windsor's landlord.

With respect to the warehouse equipment, Strauss is liable for the $12,000 it agreed to pay for the warehouse equipment.  While the equipment may have been collateral for the loan required to purchase the equipment, Rodriguez testified that the $100,000 received for the equipment, fixtures and improvements was to be used by him to fully repay the loan before the assets would be transferred to Strauss.  Strauss had unfettered and exclusive use of the equipment until Strauss's business was shut down and the bankruptcy case was filed.  Rodriguez remains personally liable on the loan from the bank.

With respect to the fixtures and leasehold improvements, Strauss is liable for the $88,000 it agreed to pay the Rodriguez parties for the purchase of the fixtures and leasehold improvements.  The Debtor does not point to a specific provision in the lease that says the fixtures and leasehold improvements were the property of the landlord.  Section 32.01 of the lease, entitled "Surrender," states, "Tenant shall . . . surrender and deliver up the Demised Premises to the possession and use of Landlord . . . without any payment or allowance whatever by Landlord on account of any improvements which may be on the Demised Premises."  *Id.* at

38.  The lease does not say that (to the extent possible) the Tenant cannot remove purchased fixtures or leasehold improvements prior to surrendering the Property.  The lease also does not say that the Tenant cannot benefit from such improvements by seeking payment from a subsequent tenant for the fixtures and leasehold improvements.  It only says that the Landlord will not be liable for any improvements made to the premises.

### 5.  *Sales Commissions*

Under the Letter Agreements, Twinkle was to "commence a new business *of acting as Strauss' sales representative* and shall receive a sales commission of three-quarters of one percent of the net sales (gross sales less returns and allowances) made by Strauss commencing on May 1, 2006 and thereafter."  (Ex. 9 (emphasis added)).  Furthermore, "[w]hen and if the total sales commissions paid by Strauss to Twinkle reach three hundred thousand ($300,000) dollars," the sales commission were to be renegotiated.  *Id.*

Under the terms of the Letter Agreements, the Rodriguez Parties would receive sales commissions for services performed as Strauss's sales representative.  The Letter Agreements set a cap of $300,000 for sales commissions, at which point the parties would renegotiate the commission.  However, sales commissions had to be earned.

The Court concludes that the Rodriguez Parties are entitled to the sales commissions they earned in May 2006 while employed at Strauss and acting as the sales representative.  No commissions were ever paid.[15]  After Roberto and Teresa were terminated, they were no longer acting as Strauss's sales representative and were not entitled to earn further commissions.

---

[15]     While the Debtor argues that it only agreed to pay the Rodriguezes commissions based on a percentage of the delivery sales, the Letter Agreements use the term "net sales," without distinguishing between walk-in and delivery sales.  The Court concludes that the parties intended for the Rodriguezes to receive a percentage of all net sales.

The Court cannot determine, with any specificity, the amount of commissions owed to the Rodriguezes for work performed in May 2006 because, among other reasons, Strauss improperly discarded its cash sales receipts for the relevant period.  Strauss conceded at the hearing that even if it had a particularly lucrative sales month for May of 2006 (which both parties testified it did) and had net sales of $2,000,000, Strauss would only owe the Rodriguezes $15,000 (3/4 of one percent) in commission.  As the Court cannot accurately determine the sales commissions, in part because of Strauss's spoliation of evidence, and because $2,000,000 monthly sales was the figure proposed by Strauss's counsel and no evidence was offered on the issue by the Rodriguez Parties, the Court will use that figure for the sole purpose of estimating the Rodriguezes' May 2006 sales commissions.  Thus, the Court concludes that Strauss owes the Rodriguez Parties $15,000 in sales commission.

### 6.  *Purchase of all Merchandise Inventory*

Under the Letter Agreements, "Strauss will purchase all of the merchandise inventory of food, paper good used in the food business, restaurant supplies, and all other goods and merchandise not specifically set forth herein, owned and held by Twinkle . . . ."  (*See* Ex. 9.) Furthermore, "[t]he purchase price to be paid by Strauss will be Twinkle's cost as reflected on its books and records."  *Id.*  The Rodriguez Parties offered evidence, and the Debtor did not dispute, that the cost as reflected on Twinkle's books and records for the inventory was $530,715.00. The Debtor does, however, argue that the books and records were inaccurate and inflated.  Mayer testified that the inventory was in poor shape and unable to be sold because certain food was expired, had broken packaging, mold and/or dirt.

The Debtor had months to inspect Twinkle's inventory while negotiating the Letter Agreements prior to moving into the Property.  Furthermore, because of Strauss's spoliation of

31

evidence, the Court is unable to corroborate the figure by considering the value of inventory sold

during May 2006 or thereafter, as reflected on *all* receipts (cash and credit sales) as well as the

value of the inventory returned to the Rodriguez Parties in late 2007.  Under these circumstances,

the Court concludes that the $530,715.00 inventory value is the appropriate *starting point* for

determining damages for the Twinkle inventory for which Strauss failed to pay.  As explained

below, however, that figure must be adjusted downward.

The New York Uniform Commercial Code ("UCC") section 2-607 provides that a "buyer

must pay the contract rate for any goods accepted."  N.Y. U.C.C. Law § 2-607(1) (McKinney).

Under UCC section 2-606(1)(a), a buyer accepts goods when the buyer "after a reasonable

opportunity to inspect the goods signifies to the seller that the goods are conforming or that he

will take or retain them in spite of their non-conformity."  N.Y. U.C.C. Law § 2-606(1)(a)

(McKinney).  A buyer also accepts goods by "fail[ing] to make an effective rejection (subsection

(1) of Section 2-602), but such acceptance does not occur until the buyer has had a reasonable

opportunity to inspect them."  N.Y. U.C.C. Law § 2-606(1)(b) (McKinney).  "Where a tender has

been accepted the buyer must within a reasonable time after he discovers or should have

discovered any breach notify the seller of breach or be barred from any remedy."  N.Y. U.C.C.

Law § 2-606(3)(a) (McKinney).  Mayer's testimony demonstrates that Strauss notified the

Rodriguez Parties of its displeasure with the condition of at least some of the inventory and

Strauss is not barred from asserting a breach of the implied warranty of merchantability.

Strauss is not responsible to pay contractual damages for goods that were not

merchantable under the implied warranty of merchantability.  UCC Section 2-314 states:

> (1) Unless excluded or modified (Section 2-316), a warranty that
> the goods shall be merchantable is implied in a contract for their
> sale if the seller is a merchant with respect to goods of that kind.

Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.

N.Y. U.C.C. Law § 2-314 (McKinney).

The parties here were merchants, and the Letter Agreements provided, in part, for the sale of goods.  Section 2-316 provides a mechanism to disclaim the implied warranty of merchantability; the Letter Agreements contain no such language.  Goods satisfy the implied warranty of merchantability if "the article is reasonably fit for the ordinary uses for which it was manufactured," although the goods need only be of "medium quality or goodness."  *In re First Hartford Corp.*, 63 B.R. 479, 490 (Bankr. S.D.N.Y. 1986) (quoting *U.S. Leasing Corp. v. Comerald Associates, Inc.*, 421 N.Y.S.2d 1003, 1005 (Civ. Ct. 1979)).  Under UCC section 2-607, the burden is on the purchaser of goods to establish any breach with respect to goods accepted.  N.Y. U.C.C. Law § 2-607(4) (McKinney).  Until questioned by the Court, however,

neither party raised in its briefs or oral arguments the governing UCC provisions or the implied warranty of merchantability.

Strauss argues that it should not be required to pay for 1,800 pounds of meat that was condemned by the Department of Agriculture (*see* Ex. 48).  However, the Court received conflicting testimony whether the meat was part of the Strauss or Twinkle inventory and whether the meat became unsellable because it was removed from refrigeration for an extended period to create space for Strauss's inventory.  Most important, Strauss has not provided a value of the meat that was condemned.  Thus, Strauss has not met its burden of (i) proving that the meat was defective at the time it was accepted, or (ii) establishing the value of the meat that should be deducted from Twinkle's inventory value.

Strauss also included photographs of a few items of expired cheese and hot dogs (*see* Ex. 45).  While expired food would not be merchantable, Strauss similarly failed to introduce evidence of the value or quantity of the expired food.  Strauss submitted evidence that certain food items were donated to a food bank (*see* Ex. 66) because they were allegedly unsellable (which Roberto Rodriguez disputes); however, Strauss did not introduce evidence of the value of the donated items.  Because Strauss has the burden of proof and has failed to adequately demonstrate the value of the non-merchantable inventory that was expired or donated, the Court will not deduct the value of the meat, cheese, or donated items from the $530,715.00.

However, the Court will deduct the value of inventory Strauss returned, or made available for return, to the Rodriguez Parties.  Rodriguez testified that he created a spreadsheet (Ex. 75) based an inventory done by Strauss (Ex. 15 and 16) of Twinkle's remaining goods still in Strauss's possession as of February 16, 2007.  (*See* Ex. 7.)  The state court had offered the Rodriguez Parties the opportunity to recover the unsold Twinkle inventory as early as July 6,

34

2006 (*see* Ex. 6 at 29:16), but the Rodriguez Parties did not avail themselves of this opportunity

until late 2007.  This is understandable, in part, since Strauss occupied the Property and the

Rodriguez Parties had no place to store the Twinkle inventory if they recovered possession.

When the Rodriguez Parties finally recovered some of the unsold inventory, Rodriguez testified

that he subsequently sold some of it.  The spreadsheet provided by the Rodriguez Parties lists the

goods and cost by item, but Rodriguez could not recall where he obtained the cost included in the

spreadsheet.  The spreadsheet lists the cost of inventory returned, or available for return, as

$91,949.40.  Under all of the circumstances, for purposes of estimation, the Court concludes that

the $530,715.00 inventory value should be reduced by $91,949.40.

Mayer also testified that he was forced to pay a judgment (*see* Ex. 14) to R-Best Produce

Inc. ("R-Best") in the amount of $17,500 for goods for which the Rodriguez Parties were liable.

Mayer stated that in paying the judgment, he applied $10,000 Strauss had initially segregated as

funds belonging to Twinkle based on Strauss's collection of Twinkle accounts receivable after

the businesses were combined.  Strauss paid the remaining $7,500 from its own funds.

Rodriguez did not dispute Mayer's testimony.  Because Strauss paid for goods that Twinkle

rather than Strauss was obligated to pay, Strauss is entitled to a reduction in the amount due for

the inventory.[16]  Therefore, Twinkle's damages should be further reduced by $7,500.

Last, Strauss asserts (and Rodriguez did not dispute) that it paid Twinkle's rent for

February and March 2006 totaling $50,000.  While Rodriguez claims that the $50,000 was

ultimately intended to be paid to Windsor's landlord to increase the security deposit in

contemplation of the new lease with Strauss, Rodriguez acknowledged that the payments were

---

[16]    Strauss and Twinkle relied on many of the same vendors.  If Strauss failed to pay for the unpaid inventory
purchased by Twinkle, and being sold by Strauss after May 1, 2006, Strauss faced the substantial risk that its
vendors would no longer sell it goods.

structured as loans. As the Rodriguez Parties never returned the funds and because the money

was used to pay Twinkle's rent and was never used to increase Windsor's security deposit, the

Rodriguez damages must also be reduced by the $50,000.

After making the adjustments explained above, the Court concludes that the Rodriguez

Parties are entitled to a claim for damages for the inventory in the amount of $381,265.60.

## III.    CONCLUSION

The Court concludes that the Letter Agreements constituted a valid enforceable contract

that was breached by Strauss. As a result, for voting and distribution purposes pursuant to

section 502(c), the Court estimates the value of the Rodriguez Parties' Claim No. 33 at

$496,265.60, consisting of the following:

(i)     $381,265.60 for Strauss's failure to purchase Twinkle's inventory,

(ii)    $12,000 for Strauss's failure to pay for the Rodriguez Parties' warehouse
equipment,

(iii)   $88,000 for Strauss's failure to pay for the fixtures and leasehold improvements,
and,

(iv)    $15,000 for sales commissions for May 2006.

**IT IS SO ORDERED.**

Dated:    July 17, 2013
New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge